**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **BENJAMIN J.B.,[1]** )<br>)<br>**Plaintiff,** )<br>)<br>**vs.** )<br>)<br>**COMMISSIONER OF SOCIAL** )<br>**SECURITY,** )<br>)<br>**Defendant.** | **Case No. 3:20-CV-00608-MAB** |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.[2]

## Procedural History

Plaintiff applied for DIB on July 28, 2017, alleging a disability onset date of February 2, 2016 (Tr. 13). The claim was initially denied on December 18, 2017 and upon reconsideration on June 29, 2018. Soon after, Plaintiff filed a written request for a hearing, which was received on July 23, 2018. After holding an evidentiary hearing, an ALJ denied the application on June 13, 2019 (Tr. 10-23). During the evidentiary hearing, the disability

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 12).

onset date of February 2, 2016 was amended to August 1, 2017 (Tr. 13). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final agency decision subject to judicial review. Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issue:

1. The ALJ failed to properly evaluate Plaintiff's Residual Functional Capacity ("RFC"), specifically fully taking into consideration Plaintiff's medically determinable impairment of obesity and the symptoms and conditions that result from and are worsened by his obesity.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.,* and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.,* and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential,

it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. He determined that Plaintiff had had not engaged in substantial gainful activity since February 2, 2016, Plaintiff's first onset date (Tr. 16). Plaintiff continued to work until January 2018, when he was terminated (Tr. 16). In 2017, he earned an average of $612.99 per month while the level of substantial gainful activity was $1,170.00 per month; therefore, his earnings were less than the level of substantial gainful employment even though he continued to work (Tr. 16).

Plaintiff was born on November 7, 1983 and was 32-years old at the time of the alleged disability onset (Tr. 21). The ALJ found that Plaintiff had severe impairments of spine disorder, obesity, and obstructive sleep apnea (Tr. 16).

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §404.1567(b) with the following limitations:

> He can lift and carry up to 20 pounds occasionally and 10 pounds frequently. He can stand or walk for a total of two hours in an eight-hour workday and sit for up to six hours in an eight-hour workday. He requires a sit/stand option, in which he would need five (5) minutes of repositioning at his workstation after 20 minutes of sitting. He can occasionally climb ramps and stairs, but can never climb ladders, ropes, or scaffolds. He can frequently balance; occasionally stoop, kneel, crouch, and crawl. He should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.

(Tr. 18).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff

could not do his past work as a fast food cook (Tr. 21). However, he was not disabled because was able to do other jobs that exist in significant numbers in the national economy (Tr. 22).

<u>**The Evidentiary Record**</u>

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

**1.      Evidentiary Hearing**

At the time of the April 30, 2019 hearing, Plaintiff was 36-years old and had received his GED from high school (Tr. 32). Plaintiff was represented by an attorney at the hearing. (Tr. 30).    Plaintiff lived with his fiancé and her three children at the time (Tr. 36). Plaintiff testified that he is approximately 6'5" and weighs over 600 pounds (Tr. 41-42). He was weighed about three months before the hearing at his doctor's office, and the scale only went up to 600 pounds and his weight passed that mark (Tr. 42). He had been around this weight for 3-4 years prior to the hearing (*Id.*).

The ALJ questioned Plaintiff about his prior work history, including his time working as a fast food crew trainer starting in September 2005 (Tr. 33). Plaintiff held this position until approximately January 2018 when he was fired (*Id.*). Plaintiff described that the day he was fired, he forgot to "ring up" his shift meal, so his boss claimed he stole it (*Id.*). Plaintiff believed this was pretense, however, because his hours were slowly cut prior to this incident. Plaintiff believes he was fired due to his medical conditions.

Plaintiff testified that he amended his disability onset date from February 2, 2016

to August 1, 2017 (Tr. 33-34). On August 1, 2017, Plaintiff slipped carrying a box into the freezer at work. He was sent home and went to the emergency room for back pain and spasms (Tr. 34). After this incident, Plaintiff found it hard to stand at work to make food. He would have to sit down because his back was bothering him (Tr. 34-35). Plaintiff described having to sit down 3-4 times a four-hour shift depending on how much pain he was experiencing (Tr. 35). Plaintiff estimated this was approximately 1-2 times an hour.

The ALJ also questioned Plaintiff about his medical conditions and how they impacted his ability to engage in gainful employment. Plaintiff testified that while he was trying (at the time of the hearing) to find a job as a bus driver, he had to pass a physical exam that he could not pass due to his conditions (Tr. 36). Plaintiff described having issues cleaning himself properly after using the bathroom and that he requires help from his fiancé (Tr. 36). Plaintiff testified that he has issues bending over, standing up, and sitting down for too long. He explained he can sit in a chair comfortably for 15 minutes because while he is in constant pain, the pain increases when he stands or sits without moving for a prolonged period of time (Tr. 36). Plaintiff also testified that while he is able to drive, he can barely fit in the car and cannot wear a seatbelt because it does not fit (Tr. 37). Due to back and knee pain, he cannot carry out the trash easily or even carry a gallon of milk without issue (*Id.*).

Plaintiff also testified that he sometimes feels nauseous from the medications he takes for his ailments (*Id.*). He is not able to take his fiancé on dates because he cannot do physical activities, including walking (Tr. 38). Plaintiff will go to his fiancé's children's

softball games, for example, but watch from his car, as he cannot sit on the bleachers (*Id.*). Plaintiff completed a round of physical therapy over the course of several weeks, but testified that the physical therapists did not know what else to do to help him since he was "so big" (Tr. 38-39).

Plaintiff's attorney questioned him as to his lymphedema.[4]  Plaintiff testified that because of this condition, he struggles to walk and it is hard for him to wear shoes, so he wears sandals everywhere (Tr. 40). Plaintiff described that everything below both knees is swollen and filled with water (*Id.*). Although he wraps his legs for relief, walking and standing make his legs swell (Tr. 41). Around the house, Plaintiff is able to help with chores by putting the dishes in the dishwasher, but has to sit while doing so, as he cannot bend over (*Id.*). As for Plaintiff's back pain, his doctor recommended he get an MRI, but he is too large to fit in any MRIs, including the open MRIs (*Id.*).

Plaintiff testified that he also experiences depression, including borderline suicidal thoughts at times (Tr. 42). He takes medication for his depression which helps, but he still experiences depression occasionally (*Id.*).

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to identify his testimony, if needed, that was inconsistent or deviated from the Dictionary of Occupational Titles, to which the VE agreed (Tr. 43). The VE assessed Plaintiff's prior

---

[4] Lymphedema refers to tissue swelling caused by an accumulation of protein-rich fluid that's usually drained through the body's lymphatic system. It most commonly affects the arms or legs. Symptoms of lymphedema often include swelling in the arms and/or legs, including in the fingers and toes. *See* MAYO CLINIC, *Lymphedema – Symptoms and Causes*, available at https://www.mayoclinic.org/diseases-conditions/lymphedema/symptoms-causes/syc-20374682 (last visited Sept. 23, 2021).

work as a fast food cook (DOT number 313.374-010) as having an exertional level of medium and a Specific Vocational Preparation ("SVP") level of 5[5] (Tr. 43). The VE was questioned about a hypothetical individual with the same age and education as Plaintiff who could lift and carry 20 pounds occasionally and frequently lift and carry 10 pounds; stand and walk two out of eight hours; sit six out of eight hours; occasionally climb ramps and stairs, but can never climb ladders, ropes, and scaffolds; frequently balance; occasionally stoop, kneel, crouch, and crawl; and needed to avoid fumes, odors, dust, and poor ventilation. The ALJ asked the VE if this hypothetical person could complete Plaintiff's past work, and the VE responded in the negative (Tr. 44). The VE explained, though, that this hypothetical person could be a ticket checker (DOT 219.587-010) as it has an exertional level of sedentary and an SVP of 2 (Tr. 44). The VE testified there are approximately 71,000 jobs in the national market. Additionally, this hypothetical person could be a charge-account clerk (DOT number 205.367-014) as it has an exertional level of sedentary and an SVP of 2 (Tr. 44). There are approximately 33,000 jobs in the national economy. Finally, this person could be an Order Clerk (DOT number 209.567-014) with an exertional level of sedentary and an SVP of 2. This job has approximately 19,000 positions in the national economy (Tr. 44).

The ALJ then asked the VE to keep the limitations listed above, but add that the

---

[5] A job with an SVP level of 5 is considered skilled. Jobs with an SVP of 1-2 are unskilled while those rated 3-4 are semiskilled. Anything rated a 5 or higher is considered skilled. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001 (last accessed September 22, 2021).

individual would need five minutes of repositioning after 20 minutes of sitting (Tr. 44-45). The ALJ asked if this repositioning, in the hypothetical, would have any effect on the jobs the VE identified, and the VE answered in the negative (Tr. 45). But, if the repositioning could not happen at the workstation, the VE testified that would preclude this person from work (Tr. 45). This sit/stand option is not addressed in the DOT, so the VE had to testify based on his own observation, experience, knowledge, and education (Tr. 45).

Plaintiff's attorney questioned the VE, and asked if the hypothetical individual needed to elevate their legs at least 20 minutes out of every hour, would that effect their ability to do the jobs outlined by the VE. The VE testified that accommodation would preclude work entirely (Tr. 45).

### 3.    Relevant Medical Records

Plaintiff submitted medical records to aid the ALJ in his determination. The records indicate that Plaintiff has been over 500 lbs. for the duration of his alleged disability. When he went to the doctor on January 20, 2017, his weight was recorded as "out of range" (Tr. 256). On June 14, 2018 and August 28, 2018, his weight is recorded as "unable to weigh" and "out of range," respectively (Tr. 353; 367). On January 4, 2019, the medical records include that "scales in office and in PT don't register his weight" (Tr. 360).   On August 1, 2017 and August 28, 2017, emergency room personnel described Plaintiff's appearance when he was lying in a hospital bed. They recorded that his body covered the entire bed with flanks hanging over the bilateral edges of the bed (Tr. 311; 400).

The medical records indicate Plaintiff has other diagnoses and conditions related to and resulting from his obesity, such as edema.[6] On August 8, 2018, Plaintiff saw Jenny Deyto, PA-C, who recorded that Plaintiff was morbidly obese, had a mild body odor, limited ambulation with antalgic gait secondary to body habitus, edema of bilateral ankles, feet, pretibial, non-pitting.[7] She diagnosed Plaintiff with edema of the lower extremity, likely due to poor venous return as the result of morbid obesity (Tr. 370).

Edema is recorded as one of Plaintiff's diagnoses in his medical records dated September 17, 2018 and October 3, 2018 as well (Tr. 382, 366). At the October 3, 2018 appointment, Physician's Assistant Jenny Deyto, PA-C, recorded that Plaintiff is morbidly obese with limited ambulation/antalgic gait due to body habitus. He has decreased breath sounds due to body habitus as well as limited range of motion. He has edema of bilateral ankles, feet, pretibial, non-pitting. Additionally, Plaintiff reported that he does not leave home often due to his weight (Tr. 366). These symptoms continued at subsequent doctor visits on January 4, 2019 and January 24, 2019 (Tr. 362, 380).

Plaintiff experiences depression related to his obesity, as well as sciatica, chronic lower back pain, bilateral foot pain, Somatic Symptom Disorder, and breathing issues related to COPD (Tr. 350).

---

[6] Edema is a swelling caused by excess fluid trapped in the body's tissue. *See* MAYO CLINIC, *Edema*, https://www.mayoclinic.org/diseases-conditions/edema/symptoms-causes/syc-20366493 (last visited September 21, 2021).

[7] Non-pitting edema refers to swelling in a certain area of the body that does not respond to a finger being pushed into that localized area. *See Healthline: What is Non-Pitting Edema and What Causes it?*, https://www.healthline.com/health/non-pitting-edema (last visited September 22, 2021).

4.      **Agency Forms**

In a Function Report submitted on August 30, 2017, Plaintiff detailed that he is unable to stand for a long time, has trouble lifting, and cannot bend or crouch very well (Tr. 189). He reported that he does not care for other family members, including children or a spouse, and that it is difficult for him to bathe himself, put on socks, and complete basic hygiene tasks related to using the bathroom (Tr. 190). He explained that he can drive a car (Tr. 192). He also explained that he can lift 30 lbs., but cannot squat or bend without pain (Tr. 194).

Plaintiff's mother also submitted a Function Report, dated August 31, 2017 (Tr. 202), in which she described that Plaintiff is in constant back pain and unable to stand for long periods of time and cannot pick up heavy merchandise (Tr. 202). She described that Plaintiff struggles to sleep in his bed when he is experiencing severe back pain and also mentioned he cannot clean himself after using the restroom and requires her help (Tr. 203). She said his depression makes it difficult for him to get motivated, but he is able to cook his own meals (Tr. 204-205).

5.      **State Agency Consultants' Opinions**

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from prior administrative findings at Plaintiff's initial stages of applying for benefits.

For example, Defendant referred Plaintiff to Stephen Vincent, PhD, for a consultative examination ("CE") on June 14, 2018. He recorded that Plaintiff was morbidly obese with a "disheveled and unkempt" appearance and a "rather noticeable

and offensive body odor" (Tr. 347). At this time, Plaintiff presented with complaints of chronic back pain with radiation of pain down both legs making it difficult for him to lift, bend, stand, and stoop without pain and/or discomfort (Tr. 347). Plaintiff described difficulties maintaining employment due to his multiple medical issues and difficulties standing and moving due to pain (Tr. 347, 348). Dr. Vincent diagnosed Plaintiff with a mood disorder secondary to general medical conditions with major depressive like-features. Additionally, he was diagnosed with somatic symptom disorder, which is characterized by an extreme focus on physical symptoms, such as pain or fatigue, which causes major emotion distress and problems functioning. *See* Mayo Clinic, *Somatic Symptom Disorder*, https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776 (last visited Sept. 23, 2021). These physical symptoms may or may not be associated with a diagnosed medical condition, and may become such a central focus in the individual's life such that it becomes difficult to function. *Id.*[8] Dr. Vincent described that Plaintiff was preoccupied with pain and required some redirection and refocusing (Tr. 349).

Plaintiff also had a consultative physical examination in June 2018 with Dr. Leung (Tr. 352-355). Plaintiff described his chief issues to be back pain and COPD (Tr. 352). Plaintiff described that he has sciatica with pain running down his left leg, which he

---

[8] American Psychiatric Association: What is Somatic Symptom Disorder?, available at https://www.psychiatry.org/patients-families/somatic-symptom-disorder/what-is-somatic-symptom-disorder (last accessed September 22, 2021).

attempted to treat with physical therapy, which did not help, but pain medications do help "a little" (Tr. 352). During the musculoskeletal examination, Dr. Leung determined that Plaintiff walked with a "waddle," and a "moderate limp" (Tr. 354). But, Plaintiff was observed walking 50 feet unassisted and without an assistive device. Additionally, he was able to squat less than ¼ of the way down (Tr. 354). Pinch strength, arm, leg, and grip strength were five out of five, according to Dr. Leung (Tr. 354). Dr. Leung determined that because of Plaintiff's sciatica, he had decreased range of motion in his lumbar spine. Additionally, Dr. Leung recorded that Plaintiff is morbidly obese and has chronic obstructive pulmonary disease (Tr. 354-355).

Also that month, on June 28, 2018, Plaintiff was examined by Dr. Bharati Jhaveri during the reconsideration process of his initial application for disability benefits (Tr. 56-67). Dr. Jhaveri found that Plaintiff had chronic pain in his back and feet, which was sometimes stabbing and shooting pain related to sciatica (Tr. 60). While able to drive, Dr. Jhaveri noted that Plaintiff had a low energy level, was negative and pessimistic, and reported having "no motivation" (Tr. 60). Dr. Jhaveri noted that Plaintiff went to physical therapy, but that it did not help with his pain, but pain medication helps somewhat (Tr. 64). Dr. Jhaveri observed that Plaintiff walked with a waddle and moderate limp, but was able to move without assistive device 50 feet (Tr. 64). Dr. Jhaveri was unable to obtain Plaintiff's exact weight, but noted that he is 500+ pounds and, therefore, morbidly obese (Tr. 64). Dr. Jhaveri determined that Plaintiff could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance; frequently stoop; frequently kneel; frequently crouch; and frequently crawl; however, did not include

specific facts upon which those conclusions were based (Tr. 64).

<u>Analysis</u>

In this appeal, Plaintiff advances one main argument in support of his contention that remand is appropriate. He asserts that the ALJ, in determining Plaintiff's RFC, failed to consider all aspects of his obesity and the secondary issues and diagnoses he has because of his obesity that preclude him from working.

Defendant argues that the ALJ's decision is supported by substantial evidence, as he based his RFC determination on the opinion of the state agency reviewing physician, Dr. Jhaveri, who assessed Plaintiff as having a light work capacity, as well as other portions of the record that indicated Plaintiff was able to continue working with some accommodations (Doc. 31, pp. 5-7). Additionally, Defendant argues that Plaintiff has the burden of production and persuasion for steps one through four of the analysis, with the burden shifting to Defendant only at step five (Doc. 31, p. 7). Fatal to his argument, Defendant argues, is that Plaintiff has failed to identify any acceptable medical source that supports finding that Plaintiff had additional physical and mental functional limitations (Doc. 31, p. 10). Finally, Defendant argues that Plaintiff was represented by counsel at the hearing and did not produce an opinion for an examining medical provider that would support further or greater limitations than those found by the ALJ; therefore, Plaintiff's arguments fail and remand would be improper.[9]

---

[9] Defendant argues that Plaintiff bore the burden to produce medical records to show he is disabled and fell short, essentially, because he did not provide a medical expert to prove he is disabled. But the authority Defendant relies on here - *Eichstadt v. Astrue,* 534 F.3d 663, 668 (7th Cir. 2008) – is distinguishable because in *Eichstadt,* the plaintiff failed to submit *any* medical records in support of her claim for disability benefits.

While some of Defendant's arguments touch on other steps in the disability benefits analysis, Plaintiff's main argument is that the ALJ did not properly develop the RFC to account for his obesity. The RFC is a measure of what an individual can do despite his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

Plaintiff argues that the ALJ failed to properly evaluate the effects of his "extreme obesity" as these symptoms alone preclude his ability to maintain full-time, competitive work (Doc. 25, p. 4). Plaintiff points to the plain language of Social Security Ruling (SSR) 19-2p, which instructs the ALJ to consider the "limiting effects of obesity" in assessing a person's RFC, since obesity itself is not a listed impairment, but the impairments of

---

The Seventh Circuit did not hold that claimants must provide medical experts; rather, it held that the claimant has the burden to produce medical evidence to support his disability. *Id.* at 667-68. Plaintiff has done that in this case. Additionally, this argument is a slightly tangential one, as Plaintiff's case is based on an improperly developed RFC and not, necessarily, an improper determination as to his disability status beyond how it relates to the RFC.

obesity may equal a listing.[10] Plaintiff also points to the record as a whole, and argues that the ALJ failed to fully consider all of his symptoms from his obesity to create the logical bridge between the record as a whole and the ALJ's determination that Plaintiff can still maintain some sedentary work (Doc. 25, p. 9). The Court agrees.

The ALJ determined that Plaintiff had three severe impairments: spine disorder, obesity, and obstructive sleep apnea (Tr. 16). The ALJ examined Plaintiff's diagnosis of depressive disorder, but found that the record overall did not describe symptoms that would be more than a minimal limitation of his work-related abilities (Tr. 16). Obesity is not a standalone disabling impairment. Even so, the ALJ must consider its impact when evaluating the severity of a claimant's other impairments. *Stephens v. Berryhill*, 888 F.3d 323, 328 (7th Cir. 2018) (citing *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016) (citing *Castile v. Astrue*, 617 F.3d 923, 928 (7th Cir. 2010)). The Seventh Circuit has recognized that the combined effects of obesity with other impairments may be worse than those same impairments without obesity. *Martinez v. Astrue*, 630 F.3d 693, 698-99 (7th Cir. 2011) ("It is one thing to have a bad knee; it is another thing to have a bad knee

---

[10] "We must consider the limiting effects of obesity when assessing a person's RFC…A person may have limitations in any of the exertional functions, which are sitting, standing, walking, lifting, carrying, pushing, and pulling. A person may have limitations in the nonexertional functions of climbing, balancing, stooping, kneeling, crouching, and crawling. Obesity increases stress on weight-bearing joints and may contribute to limitation of the range of motion of the skeletal spine and extremities. Obesity may also affect a person's ability to…tolerate extreme heat, humidity, or hazards…We assess the RFC to show the effect obesity has upon the person's ability to perform routine movement and necessary physical activity with the work environment…In cases involving obesity, fatigue may affect the person's physical and mental ability to sustain work activity. This may be particularly true in cases involving obesity and sleep apnea." *See* SSR 19-2p: Titles II and XVI: Evaluating Cases Involving Obesity, available at: https://www.ssa.gov/OP_Home/rulings/di/01/SSR2019-02-di-01.html (last visited September 21, 2021).

supporting a body mass index in excess of 40. We repeat our earlier reminder that an applicant's disabilities must be considered in the aggregate. Enough said.").

In constructing the RFC, the ALJ seems to have relied heavily on the report of Dr. Jhaveri, conducted in June 2018 at the direction of Defendant. Dr. Jhaveri determined that Plaintiff could frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; frequently balance; frequently stoop; frequently kneel; frequently crouch; and frequently crawl; however, did not include specific facts upon which those conclusions were based (Tr. 64). The ALJ discussed that Dr. Jhaveri's opinion was "well supported" and modified Plaintiff's RFC to include that he could occasionally (not frequently) climb ramp and stairs; never (instead of occasionally) climb ladders, ropes, or scaffolds; frequently balance; and occasionally (not frequently) stoop, kneel, crouch, and crawl to account for evidence of subsequent treatment available to the ALJ, but not Dr. Jhaveri at the time of her report (Tr. 18, 21). The ALJ determined that Dr. Jhaveri's opinion was "consistent with the available medical evidence" as she also "explained how [the medical evidence] supported the limitations she provided" (Tr. 21).

A close look at the record, however, does not support this assertion. In the portion of the form in which Dr. Jhaveri could have written her explanation describing how she determined that a morbidly obese man can frequently crawl and occasionally climb ladders, she simply writes "see above" presumably pointing to a short paragraph of her initial observations of Plaintiff (Tr. 64). There is no acknowledgement or explanation of how Plaintiff's morbid obesity impacts his mobility, despite evidence that Plaintiff weighed "500+ pounds. Unable to obtain exact weight" during this examination (Tr. 64).

Even without further examination of the record, the modifications made by the ALJ to adapt Dr. Jhaveri's findings into the RFC are not supported by the record in that they fail to account for Plaintiff's obesity on their face. *See Goins v. Colvin*, 764 F.3d 677, 682 (7th Cir. 2014) ("If we thought the Social Security Administration and its lawyers had a sense of humor, we would think it a joke for its lawyer to have said in its brief that the administrative law judge 'accommodated [the plaintiff's] obesity by providing that she could never [be required as part of her work duties to] climb ladders, ropes, or scaffolds, and could only occasionally climb ramps or stairs, balance, kneel, crawl, stoop, and/or crouch'…Does the SSA think that if only the plaintiff were thin, she could climb ropes? And that at her present weight and with her present symptoms she can, even occasionally, crawl, stoop, and crouch?").

A huge thrust of the ALJ's RFC determination seems to be based on his belief that Plaintiff could move, as he describes, without much difficulty (Tr. 17-19). While the ALJ did mention that Plaintiff's body mass index ("BMI") was between a 63.2 to a 71.1 (the Centers for Disease Control indicate that a BMI of 30 or greater is obese), he determined that Plaintiff was still able to ambulate effectively without an assistive device (albeit with an abnormal gait) and could stand for a "few hours" before needing rest (Tr. 19). The ALJ fails to discuss any of the evidence that contrasts with this opinion, however, and fails to explicitly discuss how Plaintiff's significant weight impacts his other diagnoses. As just one example, during a June 14, 2018 consultative examination paid for by Defendant, Dr. Raymond Leung, M.D. did not ask Plaintiff to get up on the examination table due to his size and remarked that Plaintiff even struggled getting up from a chair (Tr. 354). The

Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). The ALJ did just this in constructing Plaintiff's RFC.

To explain further, Plaintiff described how limited his daily activities are by his spine disorder and obesity. Plaintiff testified that he can barely fit in a car and even though he does still drive, he cannot wear a seatbelt due to his size, which limits his travel (Tr. 37). Additionally, Plaintiff described that he is too large to fit in an open MRI, so even though his doctors have suggested that he get an MRI to determine the source of his back pain and further treatment, he is unable to do so (Tr. 41). At a January 20, 2017 emergency room visit, Plaintiff was instructed that he would need an MRI for additional treatment for his back, but they first had to obtain his weight, which they were unable to do (Tr. 257). Plaintiff testified that he cannot carry out the trash or a gallon of milk without issue and struggles to walk in general because of his edema (Tr. 37, 40). Due to Plaintiff's size, he also must sit in a recliner and elevate his legs due to edema in his legs (Tr. 40, 41, 362, 365, 368-70, 373, 380, 381, 392). The Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding." *Pamela K. S. v. Comm'r of Soc. Sec.*, No. 19-CV-1112-RJD, 2020 WL 4040908, at *10 (S.D. Ill. July 17, 2020) (citing

*Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005)). Here, though, the ALJ simply said that the medical records indicate that Plaintiff's description of his ailments and symptoms are not as severe as he claims them to be (Tr. 19).

In addition to Dr. Jhaveri's examination, the ALJ points to other portions of the record that support his determination in his decision. For example, the ALJ points to Plaintiff's continued work after the date of his alleged disability onset as evidence that his conditions and symptoms are not as extreme as described by Plaintiff. And it is true that Plaintiff continued to work for approximately five months after his alleged injury at work that exacerbated his back pain (Tr. 19). But the fact that someone works is not sufficient grounds for concluding that the person is not disabled. The Seventh Circuit has repeatedly held that "even persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits." *Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014),(citing *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir.2012)); *see also Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir.2004); *Henderson v. Barnhart*, 349 F.3d 434, 435 (7th Cir.2003). Similarly, the ALJ cherry-picked portions of the record in terms of the impact of medications to alleviate some of Plaintiff's symptoms (Tr. 19). Specifically, the ALJ pointed to an August 2017 hospitalization during which Plaintiff reported that pain medications and muscle relaxants were successful in treating his symptoms (Tr. 50). But the ALJ failed to mention that there are also portions of the record in which Plaintiff describes that medication is *not* working and it is hard for him to get

out of bed (Tr. 369).[11]

The ALJ fails to explain why he dismissed certain portions of the record that show Plaintiff struggles with mobility and pain, and why he did not more explicitly consider the limiting effects of Plaintiff's obesity in determining his RFC. "An ALJ's failure to explicitly consider an applicant's obesity is harmless if the applicant did not explain how her obesity hampers her ability to work." *Kuhn v. Berryhill*, No. 17 C 6454, 2019 WL 1172988, at *7 (N.D. Ill. Mar. 13, 2019)(quoting *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015)) (internal citations and quotations omitted). But here, Plaintiff has described how limited his work and home lives are due to his obesity. Perhaps most distressing is the ALJ's determination that Plaintiff "is able to perform a robust range of activities of daily living, including driving, shopping, and household chores," (Tr. 19), when Plaintiff, and others, have reported that he struggles to do the most basic of daily activities, which is cleaning himself. Plaintiff described that he relies on others to help with basic hygienic tasks, including cleaning himself after toileting, and that he has a body odor that ranges from mild to offensive (Tr. 36, 190, 203, 347, 365, 369). The ALJ did not assess how these issues with cleanliness, resulting from Plaintiff's obesity, could impact his ability to work.

In sum, the ALJ ignored evidence in the record in assessing the impact of Plaintiff's diagnoses on his ability to work, specifically his significant weight and obesity

---

[11] There are other inconsistencies in the ALJ's decision, which indicate that the record, as a whole, may not have been taken into consideration. For example, the ALJ states that Plaintiff did not actively seek out physical therapy beyond one to two sessions, as recorded on or around August 28, 2018 (Tr. 19-20; 369). This portion of the record indicates that Plaintiff started physical therapy and not, necessarily, that he only went 1-2 times (Tr. 368-369).

diagnosis. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted). Here, the ALJ failed to build the requisite logical bridge in determining Plaintiff's RFC.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 23, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**